WARD (BLAKE CRUSHER CO. v.). See Case No. 1,505.

## Case No. 17,151.

### WARD et al. v. CHAMBERLAIN et al.

[5 Am. Law Reg. 330.]

Circuit Court, S. D. Ohio. May Term, 1855.[1]

#### COLLISION—VESSELS MEETING—RULES OF THE TRINITY MASTERS.

1. When two vessels are approaching each other, and the character and course of either cannot be determined by the watch on board, such vessel should be stopped or slowed until the course of the approaching vessel be ascertained, whether it be a sail or a steam vessel.

2. Some of the rules of the Trinity masters, intended to apply in navigating a river, when applied to the open sea, are more likely to produce collisions than to avoid them.

3. In certain conditions, one vessel is to keep her course, and the other to avoid her. How can a concurrence of judgment as to their position, by their respective masters, be expected, so as to comply with the rule of right, when the wind is fresh? Uncertainty in this respect produces many collisions.

4. All the rules of navigation should be simple and easily understood.

5. Complicated rules are often misunderstood, and more frequently applied to facts supposed, which have no existence.

6. So far as my limited experience on this subject enables me to speak, the rules of navigation recognized, instead of insuring safety, have greatly increased the number of collisions. Per McLean, J.

7. If the rule were, that all vessels meeting each other should turn to the right, all would understand it, and collisions would be avoided. Each vessel, in such case, would know the course of the other; and if either could not turn as directed, it would not run in the path of the other. I am aware that this is too simple and too easily understood for technical lawyers, on the bench or at the bar. It is the rule on every turnpike road, and such maxims are

always founded on common sense. Per McLean, J.

8. When fault may be attributed to two vessels, the damages are divided, and not apportioned according to the degree of fault.

[Appeal from the district court of the United States for the Southern district of Ohio.

[This was a libel filed in the district court by Eben B. Ward and others, owners of the steamboat Atlantic, against the propeller Ogdensburgh, and also in personam against her owners, Philo Chamberlain and others. The cause was heard in the district court upon the merits, and at the same time upon an exception to the libel for misjoinder of a suit in rem and a suit in personam. The exception was sustained; and, upon the merits, the libel was dismissed, and a decree entered in favor of the respondents in the sum of $3,000, as compensation for damages received by their vessel. Case No. 17,158. From this decree the present appeal was taken.]

Emmons, Swayne & Newberry, for libellants.

Spalding & Stanberry, for respondents.

McLEAN, Circuit Justice. This is an appeal in admiralty. The libellants allege that they were the owners of the steamboat Atlantic, which was engaged in the transportation of passengers and freight between the port of Buffalo, New York, and that of Detroit, Michigan; that on the 19th of August, 1852, in the evening, she left Buffalo for Detroit, with freight and a large number of passengers; that at half-past two o'clock on the morning of the 20th August, being on her usual course off Long Point, on the Canada shore, the propeller Ogdensburgh, of which Robert Richardson was master, then being on her way from Cleveland to the entrance of the Welland Canal, run into the Atlantic with great force, the bow of the propeller striking the larboard side of the Atlantic near the forward gangway, which opened her side, so that in a short time she sunk in about twenty-five fathoms water.

The respondents say, in their answer, that on the 19th of August, 1852, the Ogdensburgh, being heavily laden, left the port of Cleveland, between twelve and one o'clock, and proceeded down the lake by Fairport, in Ohio, towards her port of destination, Ogdensburgh, New York, through the Welland Canal, in Canada. That at about two o'clock on the morning of the next day, the propeller, being on her correct course, northeast by east, the wind being light from the southwest, and the weather somewhat hazy, the watch on her deck discovered a steamboat light, from two to three points on the propeller's starboard bow, at the distance, as was supposed, of about three miles. The propeller was running about seven miles an hour; her second mate, being on watch, perceived the light was nearing him rapidly, and he gave the signal to

slow; and seeing the light continued to near him, he then made the signal to stop the engine, and immediately afterward to reverse it; but, notwithstanding these precautions, a collision ensued. The true course of the Atlantic is alleged in the answer to have been, for Detroit, southwest by west, which, if pursued from the time her light was discovered, would have taken them near a mile south of the propeller. The evidence is voluminous on both sides. This, if not required, is justified by the amount in controversy; and especially by the deplorable consequences of the collision, which caused the loss of some one hundred and forty persons.

Omitting matters in detail and incidental, the evidence of the libellant makes the following case: The Atlantic was a staunch steamer of the first class, of a capacity to carry upwards of eight hundred tons, with an engine of a thousand horse power. She had her complement of officers and men, with her lights brightly burning. At the usual time of departure, between nine and ten o'clock at night, she left Buffalo for Detroit, loaded with freight, and more than five hundred passengers. In performing her two weekly trips between Buffalo and Detroit, the course of the Atlantic was usually southwest by west, and she was steered that course on the night of the collision. It was a starlight night, the wind being slight, but a haze rested upon the lake, which extended upwards some twenty or thirty feet. The lights of a vessel could be seen some five or six miles. The course of the Atlantic lay near Long Point, which projects into the lake on the Canada side, on the point of which there is a light house, and which is some sixty or seventy miles from Buffalo. After making Long Point, the Atlantic was some fifteen or twenty minutes in running abreast of it, her course being changed one-fourth of a point to the southward. At this place the former course of southwest by west was resumed. The officer of the deck, the second mate, occupied no particular place, but was on the top of the promenade deck, in the pilot house not to exceed one or two minutes, on the top of it, on the hurricane deck, sometimes on the starboard or larboard of the promenade deck. While standing in the pilot-house, the light of the propeller was made; one light was at first seen, then another, both having the appearance of glimmering stars. They were made on the larboard bow of the Atlantic, bearing three-fourths of a point. They were supposed to be lights on a sail vessel. At this time, the signal lights of the steamer were burning brightly. On seeing the lights of the approaching vessel, the helmsman of the Atlantic was ordered to port her wheel, which was done. Shortly after, from the top of the pilot-house, the lights discovered were observed to be nearing the Atlantic, and, in fact, were close to her. The wheel of the Atlantic was then ordered hard a-port. From the top of the pilot-house, and not before, the

approaching vessel, by the reflected lights of the Atlantic, was discovered to be a propeller. It was then too late to stop the steamer, and the only chance of escape, as supposed by the deck officer, was to let her go ahead. The signal lights of the propeller were looked for, but not seen. The propeller struck the steamer on the larboard side, which penetrated into the main hatch and below the water line, through which the water gushed into the Atlantic, and in one or two minutes her bow sunk, and the fires were extinguished. The stern remained above the water until sunrise the next morning. The respondents' case, as shown by the evidence on their part, is, the propeller left Cleveland, the 19th of August, 1852; was kept down the lake near the shore to Grand river, and continued from that place east-north-east until two o'clock, when she was hauled off north-east by east. Soon after this change, a light was observed on the propeller, two or two and one-half points on her starboard bow; and the helmsman was directed to keep her on her course. The light was supposed to be at a distance of three miles. The light approached the propeller, but did not appear to cross her path. In two or three minutes, the bell was rung to slow the engine, and in six minutes, more or less, the engine was stopped and reversed. Seeing that a collision was inevitable, the wheel was then put hard a-starboard, with the view to break the force of the blow. By the oaths of the captain, mate and helmsman of the propeller, at the time of the collision, her signal and other lights were burning brightly. The same witnesses say, that by the stoppage and reversal of the engine, the force of the propeller was reduced to some three miles an hour, at the time she struck the Atlantic.

It is important to ascertain the position and course of the vessel, immediately before the collision. A map of Lake Erie, made on actual survey, by the bureau of topographical engineers of the United States, was used on the trial, on which was marked the courses as proved to have been run by the respective vessels, from Buffalo and Cleveland, up to the time of the collision. This map is presumed to be accurate. McNatt, the mate of the propeller, says his watch commenced at twelve o'clock at night, and that he kept the propeller east-north east, until two o'clock, and then hauled off from the southern shore of the lake, north-east by east. and that soon after this change, the lights of the Atlantic appeared. If McNatt, as he swears, from twelve o'clock to two, steered the propeller the course she had run, east-north-east, and then changed to north-east by east. he would not have passed within ten miles of the place of collision. From the statement of Captain Richardson, the collision took place some four or five miles west by south of Long Point, the Atlantic having passed within about four miles of the lighthouse. This is only important as showing the inaccuracy of the statements of Captain Rich-

ardson and his mate, McNatt, as to the course of the propeller; and that, when she struck the Atlantic, her course was from the southern shore of the lake, at an angle with the course of the Atlantic, which must have made the larboard lights of the Atlantic, on the starboard bow of the propeller. As the vessels approached each other, on the above hypothesis, the lights would become less perceptible, and to a person on the deck of the propeller, the Atlantic would seem to be heading on to her. This supposition is sustained by the evidence in the case, and by the declarations of McNatt. that his course crossed the path of the Atlantic.

The lights of the propeller, except the signal lights, were made on the larboard bow of the Atlantic, and the larboard lights of the Atlantic, including the red light, were made on the starboard bow of the propeller. The course of the Atlantic was south-west by west, that of the propeller, as stated by McNatt, was north-east by east. Now, if the propeller had been running this line, north of the line of the Atlantic, the lights of the propeller could not be made on the larboard bow of the Atlantic. It will be recollected that the lights of both vessels, as at first seen, continued to be displayed, until the moment before the collision. The Atlantic was running westerly, the propeller easterly. it is alleged, on parallel lines: now, without a reversal of the order of nature, on this hypothesis. the starboard lights of the propeller could not be displayed on the larboard bow of the Atlantic, nor could the larboard lights of the Atlantic be made on the starboard bow of the propeller. This sufficiently demonstrates the error of the respondents, in assuming that the propeller, when the larboard lights of the Atlantic were made on her starboard bow, was north of the Atlantic. And this is the position taken in the argument.

The hypothesis that the propeller was approaching the path of the Atlantic, from the south, by an angle which displayed the light of the propeller to the larboard bow of the Atlantic, and caused her larboard lights to shine on the starboard bow of the propeller, is consistent with the evidence in the case; and the demonstration above stated is conclusive of the fact. It seems to be clear, from the facts stated, that McNatt intended to pass the bow of the Atlantic. But this does not rest upon inference alone; McNatt repeatedly declared. at different times, in explanation of the collision. and immediately after its occurrence, that he did intend to pass the bow of the Atlantic. and that he would have accomplished his purpose had not that vessel ported her wheel. These remarks were made at different times and occasions, as shown by some fifteen or twenty witnesses. Whether the declarations of McNatt, thus proved. be considered as evidence in chief. or as discrediting the witness, the result, under the facts, must be the same.

If these declarations of McNatt be true,—and on one occasion he verified their truth by an oath,—no one can doubt that the propeller was south of the line of the Atlantic. Could McNatt wish to pass the bow of a vessel behind him? This determination to cross the path of the Atlantic was carried so far as to render the collision inevitable. Until this was perceived by McNatt, to use his own words, he did not apprehend danger. The right to keep his course was, probably, an afterthought with McNatt. Seeing the terrible result of his act, it was natural for him to seek some palliation or excuse. The fact was attributed to the Atlantic in porting her helm; but he had a right to keep on his course. This right he has no doubt claimed from a rule in navigation which, under certain circumstances, allows one of two vessels meeting each other, to keep on her course, while the other is required to give way. This rule is more calculated to cause collisions than to avoid them. Is a concurrence of judgment to be expected in the masters of two vessels approaching each other, as to the conditions prescribed, even in daylight, and especially at night? A rule of navigation, to be effectual, must be simple and positive. It should be liable to no exceptions. It should be so plain that any man who knows his right hand from his left can follow it. "Where two vessels approach each other in opposite directions, each should turn to the right." Let this be observed, and there will be no collisions. The rule should apply indiscriminately to all vessels, whether propelled by wind or steam. And if it should happen that one vessel is unable to turn to the right, the other vessel will never doubt as to its course, if practicable, and that will be sufficient to avoid her.

Although the officers of the propeller saw the steamer at the distance of three miles, and from her lights knew her character, the propeller kept on her course; when the vessels approached each other very near, an order was given to slow the propeller, to stop the engine, and then to reverse it, which McNatt swears broke the force of her blow, as she could not have been moving more than at the rate of three or four miles an hour; but on other occasions, it is proved he said these measures were taken so short a time before the collision, as not materially to lessen the force of her movement. And this would seem to be the fact from the wound inflicted on the Atlantic. It is true the helm of the propeller was starboarded, when the vessels were nearly in contact, which was done, as McNatt states, not to avoid a collision, but to render the conflict less injurious by a slanting blow.

It is argued that the propeller, under existing circumstances, was bound to keep her course. That to have thrown her helm a-port while the Atlantic was from two to three points on her starboard bow, would have been a gross violation of the rules of navigation;

and several experts have given their opinion approving of the course of McNatt. Those opinions were given and the usage stated, on the hypothesis that the boats were running on parallel lines, that of the Atlantic being south of the propeller's. This supposition is shown to be incorrect from the fact that the red light of the Atlantic was seen on the starboard bow of the propeller, and the lights of the propeller made three-fourths of a point on the larboard bow of the Atlantic. This would be impossible if the propeller were running on a parallel line with the Atlantic. That the lights were seen as stated, no one can doubt, as the witnesses on both boats concur. The captain of the propeller seems to differ from his experts and the counsel. When he met McNatt on the deck, after the collision, he inquired of him if he saw the red light of the steamer, and being answered that he did, with great emphasis, the captain said, "Why did you not port?" The captain knew, as McNatt afterwards swore, that the propeller's line was from the southern shore of the lake, and that it lay across the path of the Atlantic.

The libel charges that the propeller had not her signal lights burning, and displayed as the law requires. That the deck officer of the Atlantic supposed the lights were on a sail vessel, and that he was warranted in so judging, and in running the Atlantic, Carney, the watch on the Atlantic, Brigham, an experienced seaman, who was a passenger, Rose, a fireman, Barry, the wheelman, all on board the Atlantic, and all of whom saw the approach of the propeller until she struck the Atlantic, and they all looked for signal lights, and saw none on the propeller.

Warner, respondent's witness, was on board the Atlantic; saw a white light at about 2 o'clock, or after, one point over her larboard bow; thought it was a sail vessel; when the vessels were within fifty feet of each other, he then, for the first time, saw a signal light, he thinks, but is not certain. But, Wells, McPherson, Barnes, Kenedy, Welsh, Meeler and McGrain, all hands on board of the propeller, and Mr. and Mrs. Ring, passengers on that boat, concur in saying the signal lights were nearly out, and could not be seen more than a few rods. It is true that McNatt and Captain Richardson swear that the signal lights were burning at the time of the collision, and continued to burn until the propeller landed at Erie. But the facts sworn to by these witnesses are disproved by so great a number as to leave no doubt that the signal lights were so nearly extinguished, as not to be seen further than one or two lengths of the vessel. McGrain, whose duty it was to trim the lamps, after the collision, when he came on deck, says the captain ordered him to trim that light, pointing to the signal light. The witness brushed off the scum or hard crust that was on the top of the wick of the light, picked it and put it back in its place. One of the tubes of this signal light was entirely out. The light could not be

seen, McGrain says, but little further than the length of the boat. The signal lights, unless trimmed by twelve o'clock at night, he says, would not afford a light more than twice the length of the vessel. They were not trimmed on the night of the collision, until after it occurred. Several of the witnesses saw these lamps burning after they were trimmed. As two white lights were shown by the propeller, it is argued that the officer of the deck of the Atlantic might have known they were not carried by a sail vessel. But it is proved that many sail vessels carry two white lights; and it is clear, that no number of white lights can excuse the want of colored lights which the law requires every steamer to carry.

On two grounds the propeller is clearly chargeable with fault: First, when she saw the light of the Atlantic she should have ported her helm, instead of continuing her course. The assumption that she was north of the line of the Atlantic is not sustained by the evidence, and is contradicted by the declarations of McNatt, by the lights made on the bows of both vessels, which showed the supposition was unfounded, and could not, in the nature of things, be true. No doubt is entertained that the display of lights is accounted for by the angle at which the vessels approached each other, and which is the only hypothesis sustained by the evidence. Had the propeller ported her wheel, and put it hard-a-port, there would have been no collision. This would have caused the propeller to pass the stern of the Atlantic. McNatt was either ignorant of his duty or perversely wrong, in continuing his course, and especially in his attempt to pass the bow of the Atlantic. There is no rule of navigation which sustains him, but the contrary. And to this act of his, more than any other, is the sad calamity to be attributed.

In the case of The Ann & Mary, 9 Eng. Adm. R. [2 W. Rob. Adm.] 195, the Trinity masters say: "We beg to observe to this court, that the golden rule so long established, must be strictly adhered to; it is this, that the larboard tack is to give way, and the vessel on the starboard tack to hold on." This rule when applied to the open sea is pregnant with danger, as above observed. It is salutary, no doubt, when applied in a narrow river, where its shores show the position and course of each vessel. But the masters say: "And the new rule which has been lately made for steam vessels, namely, each to put the helm a-port under all doubtful circumstances." This rule is founded on common sense and common prudence. It was disregarded by the propeller.

But in the second place, the propeller was chargeable with fault, in not having her signal lights in order. These lights, it is true, to some extent were burning. They were not entirely out, but, for all practical purposes, they might as well have been extinguished. They were so low, and so encrusted by the atmosphere, that they could not be seen scarcely twice the length of the boat. It is true the mate on deck, the captain, and one or two others, swear

those lights were burning at the time of the collision. After the collision, the captain directed McGrain to fix this or these lights. He saw the defects, and this order shows it; and it is proved by so many persons on both boats, and especially by those on board the Atlantic, who were experienced sailors, and who looked for the signal lights as the propeller approached, but did not see them, that the force of the evidence is irresistible. One witness only on the Atlantic thought he saw one of those lights at the time of the collision, but is not certain. Until Carney saw the hull of the propeller on her near approach, by the reflected lights of the Atlantic, he supposed the white lights seen were carried by a sail vessel. Had he been warned by the signal lights that the approaching vessel was a steamer, Carney says he would have stopped his vessel. Defective signal lights, which would not enable an approaching vessel to see them at such a distance as to avoid a collision, are not lights within the law. And this was the condition of the propeller's signal lights, at the time of the collision. The second ground of fault, in my judgment, is as clearly established as the first one.

But was the management of the Atlantic faultless? I think it was not. The objection that the captain, instead of standing his watch, substituted the second mate, and retired to rest, and was not seen on deck again until roused by the collision, is not in itself a fault. In this Captain Pettys, master of the Atlantic, did nothing more than was usually done by masters of steamers when the night is clear and calm. The second mate, under such circumstances, is often ordered to the deck. The assertion that the second mate was incompetent to the duties assigned him is disproved by a great number of experts, which relieves the second mate from any just imputation of ignorance or want of energy. The Atlantic had in her charge about five hundred passengers. This imposed upon the officer in command awful responsibilities. It should have quickened his solicitude and energy in the discharge of his duties. When he first descried the approaching vessel he put his helm a-port, and a moment before the contact he ordered it hard-a-port. Seeing only the white lights, he supposed the vessel carrying them to be a sail vessel. No signal lights indicating it to be a propeller were seen by him until after the collision, and after the signal lights had been trimmed.

The experts called by the libellant say that the Atlantic was very properly kept on her way without any abatement of her speed. They were right, probably, on the supposition that the propeller had been a sail vessel. From the slow progress of such a vessel, the steamer in all probability would have passed her without danger. But had the mate a right to presume the approaching light to be on a sail vessel, and to act accordingly? Technically, perhaps, he had. But could there be no doubt as to the character of the approaching vessel? Had Carney a right to hazard the safety of

his passengers on the faithful conduct of the master of the vessel in view? The lives of the passengers were ventured on the Atlantic on the character of the vessel, and the skill and efficiency of its officers. A trust was reposed in them, and not on the good conduct or skill of the officers of such vessels as they might meet. Under such circumstances, it is not enough for an officer to be within the rules of navigation so as to charge the wrong on the colliding vessel. Notwithstanding this wrong in an approaching vessel, the peril must be seen and guarded against, by an exercise of skill and firmness which, under such an emergency, might reasonably be expected from competent officers.

Prudence required, when the lights of the propeller were seen, that the Atlantic's helm should be ported, and the course of the approaching vessel ascertained; and if this could not be done except by slowing or stopping her engine, the boat should be checked or stopped. It is true that a steamer, by the present rules of navigation, may take either the larboard or starboard side of the sail vessel. This leads to many collisions, as the sail vessel may mistake the intentions of the steamer, and run across her path; but if each had to pass the other on the right, there could be no mistake.

In St. John v. Paine, 10 How. [51 U. S.] 557, speaking of the Trinity rules, the court say: "These rules have their exceptions in extreme cases, depending upon the special circumstances of the case, and in respect to which no general rule can be laid down or applied. Either vessel may find herself in a position at the time when it would be impossible to conform to them without certain peril. These cannot be anticipated, and therefore cannot be provided for by any fixed regulation. They can only be examined, and the management of the vessel approved or condemned, as the case may arise." And again, in Peck v. Sanderson, 17 How. [58 U. S.] 178, the court say: "Neither can the order to stop the engine and back, instead of changing the course of the steamship, be regarded as a fault. It would evidently have been unwise to change her course until the course of the approaching vessel was ascertained. She might be approaching at an angle that would clear the steamship, and a change in the course of the latter might produce a collision, instead of preventing it."

Carney admitted, that if he had known the approaching vessel was a propeller, he would have stopped the engine. For the safety of his boat and passengers, it was important that he should know the character of the vessel and her course. But he did not stop to ascertain either. He judged of the one by the light which appeared, and of the other, from the light made on his starboard bow. But he erred in both cases. The approaching boat was running at an angle to the line of the Atlantic, and, in such case, porting his helm then hard-a-port would not, and did not, avoid her.

The commander of a boat has no right to incur any risk which jeopards the lives of his passengers, and which he may avoid. Had the engine of the Atlantic been slowed two minutes, there would have been no collision. The experts sustain Carney in keeping the Atlantic at full speed on her course. The opinions of experienced seamen may be relied on, where there is no mistake in the facts on which it is founded. They judged in the present case from the lights made on the larboard bow of the Atlantic, not knowing whether the light so made was from the starboard or larboard light of the approaching vessel. The fact proved that the larboard lights of the Atlantic were made on the starboard bow of the propeller, which showed that the course of the propeller crossed the path of the Atlantic; and in such a case no prudent man could advise the Atlantic to keep her course and speed. Under such circumstances, a collision was certain if the vessels should meet at the point where the propeller's line crossed that of the Atlantic. When lights are made, it is always difficult, and often impossible, to tell the course of the approaching vessel; and until this shall be ascertained, the vessels should stop their engines. Where the vessels are approaching each other at an angle, whether they will meet at the angle depends upon the relative distances and speed of the boats, which no one can calculate or determine. Under such circumstances, there is no safety but in the stoppage and reversal of the engines. When vessels are approaching each other in parallel lines, or in the same lines, the helm of each should be ported.

On the approach of danger, every officer should be called to the deck, and the master, to whom the vessel is chiefly entrusted, should take the command. I am aware that this has not been required; and I am also aware that the destruction of human life has become so common from collisions of steamboats, that the country look upon them as ordinary occurrences. The Atlantic cannot be held faultless, as the measures dictated by prudence and necessity were not taken to avoid the collision.

There is evidence in the case tending to show the most reprehensible and inhuman conduct of Captain Pettys, of the Atlantic, after the collision. This has been explained, or contradicted, by other testimony. He is charged with calling, when in the lifeboat of the Atlantic, on the boat of the propeller to come and take him on that boat, as he was Captain Pettys, of the Atlantic. It seems Captain Pettys was in the boat, but that it was not he, but another person, in the same boat, who made the request. It is also stated that, when on board the propeller, he advised Captain Richardson not to go to the wreck of the Atlantic with the propeller, as the passengers were so numerous as to sink her. It is said by other witnesses that Pettys expressed much solicitude to save the passengers, and advised Captain Richardson to exert himself. Before Pettys left the sinking vessel, it is

charged that he used force to prevent the passengers from entering the boats until he and his crew was safe. This is not proved, except upon very doubtful evidence. Before he left the boat, Pettys directed her to be listed down to the starboard, with the view to elevate the wounded part above the water. The vessel was careened, but it did not save her from sinking.

Captain Pettys, it is proved, received a severe wound in the head, directly after the collision, which for a time disabled him; and it seems he was under medical treatment for some time after his arrival at Erie. He is spoken of by the witnesses as a competent and popular master. Capt. Richardson says, when the propeller reached Erie, not being acquainted with the entrance to the harbor, he hesitated about entering it, when Captain Pettys took the command of the vessel and landed her. If this be so, his wound could not have been as severe as some of the witnesses supposed. But I cannot but observe that the haste with which Captain Pettys left the sinking steamer shows that he had not the moral daring which fitted him for such a crisis. The captain of a ship should be the last to leave her; he should go down with her, or buffet the waves, rather than save himself by occupying a place in a live-boat, to the exclusion of a passenger. The wound might, perhaps, have influenced the act of Captain Pettys, and may excuse him in leaving the steamer. Carney, the second mate, remained on the wreck until after sunrise. And, from the evidence, it appears all the passengers might have been saved if they had collected on that part of the stern of the Atlantic which remained above water until after sunrise. Captain Richardson and McNatt, by unremitting and judicious efforts, rescued many of the passengers.

The weight of the responsibility for this great calamity lies on the propeller. The Atlantic was in fault, but not in the same degree as the propeller. Where the fault is mutual, the damages are divided, and not apportioned by the comparative culpabilities of the parties. The decree of the district court is reversed, and a decree will be entered that the damages stipulated be divided, one-half of which shall be paid to the libellants by the respondents. It is not improper to remark, that the additional evidence procured in this case since the decree in the district court has greatly changed its aspect. In the argument, the counsel for the libellants admitted the decree in that court was correct, on the evidence before it.

[NOTE. From the decree entered pursuant to the foregoing opinion, both parties appealed to the supreme court of the United States, where the decree was affirmed, without costs; Justices Greer and Daniel dissenting. 21 How. (62 U. S.) 572. After the going down of the mandate, and the entry of a decree pursuant thereto, further proceedings were had, by means of a bill of discovery for the purpose of enforcing the same. See Case No. 17,152, and 2 Black (67 U. S.) 430.]